## MACK HAMMONS v. THE STATE.

### No. 3548. Decided June 2, 1915.

**1.—Murder—Evidence—Threats—Co-defendant.**

Where defendant was jointly indicted with another for murder, but was alone on trial, there was no error in not admitting in evidence threats that the deceased is alleged to have made against the co-defendant, it not being shown that the defendant had knowledge of such threats.

**2.—Same—Charge of Court—Justifiable Homicide.**

· Where, upon trial of murder, the evidence showed that the deceased fled from the defendant and that defendant pursued him in hot haste, there was no error in refusing a requested charge that even if defendant and his companion pursued the deceased with the intention to kill him, yet if when they overtook the deceased, he drew a pistol and fired, defendant would be justified in killing him. ·

**3.—Same—Self-defense—Charge of Court—Evidence—Threats.**

Where, upon trial of murder, threats of the deceased were admitted in evidence, the court should have admitted the further declarations of the deceased made in the same conversation that he, deceased, had killed one man in Oklahoma, all of which was communicated to defendant.

**4.—Same—Evidence—Undisclosed Motive of Deceased.**

· Upon trial of murder, the court should not have admitted in evidence the undisclosed motive of the deceased in trying to evade a meeting with the defendant, in the absence of a showing that defendant was aware of this fact.

**5.—Same—Charge of Court—Self-defense—Presumption.**

Upon trial of murder, if the evidence raised self-defense, the court should have instructed the jury that if deceased was armed with a pistol and shot at defendant, the law presumes that the deceased intended to kill defendant. Following Clark v. State, 56 Texas Crim. Rep., 494, and other cases.

**6.—Same—Relative Strength of Parties—Charge of Court.**

Where, upon trial of murder, the defendant's evidence showed that the deceased used a pistol in attacking defendant, the court should · not have instructed the jury that they could take into consideration the relative strength of the parties, as it was irrelevant whether deceased was a smaller man than the defendant. ·

**7.—Same—Charge of Court—Limiting Right of Self-defense.**

Where defendant's charge unduly emphasized the issue limiting defendant's right of self-defense, there was no error in refusing it.

**8.—Same—Self-defense.**

See opinion expressing grave doubt whether the evidence in the case raised the issue of self-defense. Following Thumm v. State, 24 Texas Crim. App., 667.

Appeal from the District Court of Bowie. Tried below before the Hon. H. F. O'Neal.

Appeal from a conviction of murder; penalty, fifteen years imprisonment in the penitentiary. /

The opinion states the case.

*J. O. Mahaffey* and *Joe Hughes,* for appellant.—On question of threats by the deceased: Dodson v. State, 44 Texas Crim. Rep., 200; Cole v.

State, 48 id., 439; Childers v. State, 30 Texas Crim. App., 160; Nelson v. State, 58 S. W. Rep., 107.

On question of undisclosed motive of deceased: Darnell v. State, 58 Texas Crim. Rep., 585, 126 S. W. Rep., 1122; Dowell v. State, 58 Texas Crim. Rep., 482, 126 S. W. Rep., 871; Winfrey v. State, 41 Texas Crim. Rep., 538; Gant v. State, 55 id., 284.

On question of court's charge: Hickey v. State, 45 Texas Crim. Rep., 297; Vann v. State, 45 id., 434.

On question of court's charge on self-defense: Morrison v. State, 37 Texas Crim. Rep., 601; Crow v. State, 48 id., 419; Hall v. State, 42 id., 444.

On question of refusing requested charge on manslaughter: Halsford v. State, 53 Texas Crim. Rep., 42; Honeycutt v. State, 42 id., 129; Casey v. State, 50 id., 392; Sanders v. State, 50 id., 430.

On question of presumption with intent to kill: Scott v. State, 46 Texas Crim. Rep., 305; Clark v. State, 56 id., 293.

On question of intent to kill: Newman v. State, 69 S. W. Rep., 519.

*C. C. McDonald,* Assistant Attorney General, for the State.—On question of intent to kill: Stockman v. State, 24 Texas Crim. App., 387; Jeffries v. State, 9 id., 598; Gerick v. State, 45 S. W. Rep., 717.

On question of threat of deceased: Childers v. State, 30 Texas Crim. App., 160; Hart v. State, recently decided; Darter v. State, 39 Texas Crim. Rep., 40.

HARPER, JUDGE.—Appellant was convicted of murder, and his punishment assessed at fifteen years confinement in the penitentiary.

The evidence would show that there was a dance at the residence of deceased some three weeks or a month before appellant killed Pearl Stroud. Appellant played the violin at this dance. A difficulty arose between appellant and his brother, Zack Hammons. Deceased attempted to interfere in this difficulty, and appellant and Stroud had a difficulty.

Witnesses for defendant say that next morning when Joe Hokes went to deceased's home after his watch, deceased cursed Joe Hokes, and used very opprobrious language towards appellant, saying he was going to whip appellant when he met him,—one saying that deceased said he was going to kill appellant on sight. The evidence makes it clear that appellant was told about this matter, and he later saw deceased; deceased denied making any such remarks, and he and appellant, apparently, according to the record, became friendly. Several witnesses for appellant say they saw deceased subsequent to this time, and he told them, while he denied making the remarks attributed to him, and made friends, he did so to get an opportunity to kill appellant, and they so informed appellant. Two witnesses also testify that they had heard that deceased on one occasion had sought to waylay appellant and kill him, and had so informed appellant. Defendant sought also to introduce threats that deceased is alleged to have made that he would also kill Joe Hokes, contending that as appellant and Hokes were jointly

charged with the offense of killing deceased, this testimony would also be admissible. Appellant alone was on trial, and we do not think the threats, if any made, to do Hokes bodily harm were admissible. It is not shown that he had knowledge of such threats, and they could in no way have influenced his action.

The only threats in the record, after appellant admits he saw deceased, and he had denied making any such threats as the witnesses say they communicated to appellant, is the threat that deceased had said "he made friends with appellant to get the drop on him and kill him," and evidence of Ed Autrey and Grover White that they told appellant that they had heard that deceased was waylaying the road for him. Will Autrey also testified he told appellant that Stroud, deceased, was hunting for him with a gun. They also say these matters were communicated to appellant prior to the day of the fatal difficulty.

On Sunday, the 5th day of April, it appears that appellant, Joe Hokes, J. T. Markham, Grover White, Monroe Hicks and Dump Hicks had all gathered at the home of George Hicks. While they were there some engaged in playing checkers, and others engaged in "pitching dollars," deceased rode up, called Mr. Dump Hicks to one side, and borrowed a plow from him to break some land. As he started off, appellant and Joe Hokes started towards deceased and told him to hold on a minute, they wanted to see him. Deceased got on his horse and started off, when appellant called to him either, "Run you coward," or "Run you cowardly son-of-a-bitch." Deceased proceeded on his way, his horse traveling in a lope. As he started off appellant remarked if he had a horse he would overtake deceased. Joe Hokes remarked he had a horse at Grover White's, a short distance away, and he would go and get it. He did so, and as he drove back appellant got in the buggy with him. At this time some of those present suggested that they not go after deceased,—that he would be at Dump Hicks' the next day after the plow he had borrowed and they could see him then. Joe Hokes said he had to plant corn the next day, and appellant and Hokes put their horse in a run going after deceased. They overtook him near the home of Jim Stinson, when the fatal shooting took place. Deceased was riding a two-year-old pony, and never stopped running the pony until after he was shot, and he had arrived at the home of Doc Autrey. The testimony of appellant would show that when they had pursued the deceased for about a mile they overtook him, and when they did do so, deceased turned in his saddle and shot at them, when both appellant and Joe Hokes returned the shot. Some of the testimony would indicate that when appellant and Hokes overtook deceased, they stopped the buggy and shot at deceased, when he returned the shot. Their contention is that when they caught up with him they called to him to "Hold on, we want to have a friendly talk with you," when deceased drew his pistol and fired; they then stopped their buggy and began shooting at deceased as he continued to flee, emptying their pistols.

Appellant requested the court to instruct the jury that even though he and Joe Hokes pursued the deceased with the intention to kill him,

yet if when they overtook deceased he drew a pistol and fired, appellant would be justifiable in killing him. We do not think this is the law under the facts in this case. It is true that even if one goes to where another person is with the intention of killing him, yet if he commits no overt act to bring on the difficulty, he would not be deprived of his right to defend himself from an assault then made on him. But the evidence in this case presents no such state of case. When he fled from them from the home of George Hicks, and they got a horse and buggy and pursued him at a rate of speed to cause those who saw them coming to say, "Look, Joe Hokes' horse is running away," it was such an overt act in and of itself that if they pursued him with the intent to kill him or do the deceased serious bodily injury as to deprive themselves of the right of self-defense. Neither do we think the court erred under the evidence now before us in refusing to submit the issue of manslaughter. They by their course in pursuing deceased brought about the occasion of the difficulty. Nothing was said at the time of the difficulty by deceased,—he continued to flee even though he may have shot first. If they pursued him with no intention to bring on a difficulty that might result in death, self-defense might be in the case, but not manslaughter. And if they pursued him with the intention to kill or do him serious bodily injury, neither manslaughter nor self-defense would be in the case. That manslaughter is not in the case is evidenced by the testimony of appellant. He admits that after he emptied his pistol, and deceased had fled from their sight, he got out of his buggy and got the hat of deceased, which he had lost in his flight. That they drove back up the road and met Mr. Markham and others, who had followed on after them, and was asked, "Did you get him?" appellant responded, "No, we got his hat," and then testifies: "Yes, we held up our six-shooters, and Hokes said, 'I emptied mine,' and I said, 'I emptied mine,' and I said, 'If I didn't get him my gun is wrong.' I think I said those very words." This indicates anything else but a state of mind which would reduce an offense to manslaughter.

The court submitted the issue of self-defense, and if self-defense is raised by the testimony, there are several matters complained of that will necessitate a reversal of the case. In the first place, appellant proved by Josh Hicks that he had heard deceased say he was going to kill appellant on first sight, and that in the same conversation deceased told him (Hicks) that he (deceased) had killed one man in Oklahoma, and that he communicated this conversation to appellant. The court permitted the witness to testify what deceased had said about killing appellant, but refused to permit him to testify what deceased had said about killing a man in Oklahoma. In this the court erred. The fact that deceased, in a conversation, had said he was going to kill appellant, and at the same time said it would not be the first man he killed, as he had killed one in Oklahoma, would have much to do with appellant in judging the weight to give such threat, and in judging the character of man with whom he had trouble.

Again, the court permitted Rev. M. G. Nelson and H. S. Irby to

testify that on the day preceding the homicide they saw appellant in the town of Maud; that he had part of a buggy shaft about two feet long; that he went to first one store and then another, and looked in as if looking for someone. That deceased was in town at that time. Under the facts and circumstances in this case this much of the testimony was admissible, as the jury would be authorized to find that deceased was the person he was looking for, and had then determined to kill him or do him some serious bodily injury if he could find him, but failing to find him on that day, the next day when he saw him he pursued him and killed him. However, Mr. Irby was also permitted to testify: "I remember seeing Stroud in the store—he was trading there at the time, and I went on back up there to my place of business, and Stroud was in there when I went back, and I called him in the back of the store and asked him what was the matter with him and Hammons (interrupted by an objection and ruling). He told me that he and Hammons had had a fight at Stroud's house some time back, at a dance, and I told him (interrupted by an objection and ruling). Stroud told me he didn't want to have no trouble, and asked me what to do, and I told him if I was in his place I would go on home, and he had his wife and another lady with him, I don't remember who she was, whether h[is wife's sister, or his sister, and he was in a wagon, and I advised him to go out there and get in the wagon between the young lady and his wife and drive on home, and he did just what I told him." Mr. Nelson was permitted to testify, in substance, to the same thing. In approving the bills the court states: "I permitted this testimony because it tended to show that deceased was trying to avoid a difficulty with defendant, or to evade a meeting with defendant." If appellant had been shown to be aware of these facts, then the testimony would have been admissible, but there is nothing in the record to show that fact. There is nothing to show that appellant was aware of the fact that deceased was trying to evade him and avoid a difficulty with him, other than that he rode off when he accosted him the next day. On the other hand, if the testimony of his witnesses is to be believed, deceased had said he was going to kill appellant on sight, and had in fact waylaid the road to accomplish that purpose.

Again, if self-defense is in the case the complaint of appellant that the court erred in failing to instruct the jury that if deceased was armed with a pistol and shot at appellant the law presumed the deceased intended to kill appellant, presents error. Clark v. State, 56 Texas Crim. Rep., 494; Scott v. State, 46 Texas Crim. Rep., 305.

Also the criticism that the court should not have instructed the jury that they could take into consideration the "relative strength of the parties" is well founded. The evidence shows that deceased weighed only from 115 to 120 pounds, while appellant would weigh 170 pounds. When one man is shooting at another with a pistol, the fact that the man who is shooting at you is the smaller man of the two can make but little difference, and the jury might have been misled. Neither should the court have given both paragraphs seven and nine of the

charge, both of them limiting appellant's right of self-defense. This was unduly emphasizing that phase of the case. Paragraph seven sufficiently presented that phase of the law, and the criticisms thereof are without merit, but paragraph nine should not have been given.

The other matters complained of in the record we do not deem it necessary to discuss. We have said what we have on the theory that the evidence raised the issue of self-defense. The trial court apparently thought so, and submitted that issue to the jury. From reading the record we have very grave doubts that it does do so. Even though deceased had said he was going to kill appellant on sight, he did not attempt to do so when he saw appellant. On the other hand, when he got through with his business he started away, appellant called to him, and he made his horse lope off, appellant calling to him, to say the least, "Run you coward." Appellant then secures a conveyance and takes after him for the purpose of overtaking him, as he says, to see him about the remarks he heard deceased had been making, also testifying, "Yes, I realized I might have trouble if I caught him." And in answer to the question, "You were not seeking him for a friendly conversation then?" appellant replied, "He could have said, 'I am sorry for it'; if he had said something like that there would have been no trouble." This does not to our minds convey the impression that appellant was running down deceased with a view to an amicable settlement of their troubles, but rather he pursued him with no such intention or expectation. However, the trial court seemed to think that the fact that appellant on direct examination testified he sought to overtake deceased to settle their troubles peaceably, and further testified that when he overtook deceased he said, "Hold on, we want to have a friendly talk with you, and see if we can get this trouble stopped," that deceased then pulled his pistol, when appellant says he called to him, "Don't start anything like that—all we want is a peaceable settlement," presented the issue that his pursuit of deceased may have been only to affect an adjustment of their difficulties with no intention to harm deceased, and, therefore, raised the issue of self-defense. Of course, if this is the correct view of the testimony, the trial court was correct in thinking that the issue was in the case. He saw the witnesses and heard them all testify, and is more capable of judging this matter than we are from the mere typewritten sheet of the testimony. And taking this view of the testimony, we have pointed out the above errors in the record on the theory that self-defense is raised by the testimony. Had the trial court held there was no self-defense under the testimony, when we take all of appellant's testimony, we would sustain his ruling, for as held by this court in Thumm v. State, 24 Texas Crim. App., 667, p. 700: "It is an elementary principle of law that self-defense is a defensive not an offensive act." Judge Willson further says in that opinion:

"But, again, to one who brings on an affray or who prepares himself for an encounter in which he intends to wreak his malice, the plea of self-defense is not available, though his own life be imperiled in the

affray.   If a person by his own wrongful act brings about the necessity of taking the life of another, to prevent being himself killed, he can not say that such killing was 'in his necessary self-defense.   A person can not avail himself of a necessity which he had knowingly and wilfully brought upon himself.   (Willson's Texas Crim. Laws, sec. 981.) If a person voluntarily engage in a combat, knowing that it will or may result in death, or some serious bodily injury which may produce the death of his adversary or himself, he can not claim that he is acting in self-defense.    (Willson's Texas Crim. Laws,· sec. 982.)

"Apply these rules to the facts.   Defendant brought on the affray, and evidently with the intention to wreak his malice upon the deceased. If any necessity arose for him to kill the deceased to protect himself from injury, that necessity was produced by his own wilful and malicious act."

We would emphasize the law as announced by Judge Willson in that case, and we gather the impression from appellant's own testimony, he pursued deceased to force him to humbly apologize or else to wreak his vengeance upon him.   But in deference to the view taken by the trial court we do not feel authorized to hold that the issue was not raised, and for that reason the errors above pointed out present reversible error.   And if self-defense was raised, then the matters hereinbefore referred to necessitate a reversal, and the judgment is reversed and the cause remanded.

<em>Reversed and remanded.</em>